EMELINE TOOKER

v.

ELIZABETH SLOAN and others.

1. A wife, in order to settle a suit in which her husband was involved, and which he was very desirous of compromising, and which disturbed and, perhaps, distressed him, gave a mortgage on property the title whereto was in her.—*Held*, that the circumstances did not amount to duress.

2. A certificate of acknowledgment is not invalidated or affected by the want of recollection of the grantor or the commissioner as to the transaction.

3. A release by an attorney in fact of the holder of a mortgage, the latter having accepted the consideration from the former with knowledge of the release,—*Held*, binding on the principal though the attorney exceeded his authority in taking the release.

Bill to foreclose. On final hearing on pleadings and proofs.

*Mr. John Linn*, for complainant.

*Mr. R. Wayne Parker*, for Mrs. Sloan and Mrs. Mary Edwards.

*Mr. W. Brinkerhoff*, for Sistare.

*Mr. E. D. Halsey*, for Mrs. Allen.

THE CHANCELLOR.

This is a suit to foreclose a mortgage, dated December 31st, 1873, given by Daniel Sloan and his wife to Joseph S. Winston, on about twenty-one acres of land in Summit township, in Union county, to secure the payment of $4,465.87, on or before the 31st of December, 1875, with interest, payable half-yearly. The mortgage was assigned

Tooker *v.* Sloan.

by Winston to the complainant by assignment dated March 24th, 1874. Sloan and his wife conveyed the property to Mary Ann Edwards, wife of Charles P. Edwards, by deed dated June 15th, 1875, subject to the complainant's mortgage, the payment of which the grantee thereby assumed as so much of the purchase-money. On the same day last mentioned, Mrs. Edwards and her husband mortgaged the property to James M. Crossman, by two mortgages, for $4,225 and $2,000, respectively, with interest. On the 15th of December following, they conveyed to Kate Edwards eighty-four one-hundredths of an acre of the property, for the consideration of $500, all of which was paid to the attorney in fact of the complainant, in consideration of his releasing the premises so sold from the encumbrance of the complainant's mortgage. The attorney paid that money over to the complainant. Kate Edwards put upon the property so conveyed to her, a dwelling-house and other improvements of the value of about $5,000. $3,000 of the money expended thereon she borrowed of her mother, Mrs. Hannah M. Allen, on the security of a mortgage upon the property.

Sloan is dead. He died August 12th, 1866. Mrs. Sloan, by her answer, insists that the complainant's mortgage is invalid because, as she alleges, it was given under duress. She says that Winston obtained it by working on the apprehensions of her husband (then suffering from serious illness), through unlawful threats of arrest and imprisonment for crime falsely and groundlessly imputed to and charged upon him, by means whereof he was induced to gain her consent (which she gave merely to relieve him) to mortgage her property, the mortgaged premises, for Winston's benefit.

In 1871, the mortgaged premises (the whole twenty-one acres) were owned by Edwards, who, according to the statements of the answer of himself and his wife, in September of that year, conveyed it to Mr. Sloan and Granville A. Mendon, for the consideration of $21,000, subject to a mortgage encumbrance of $6,000 thereon. About the 6th of

May, 1873, the interest of Sloan and Mendon in the property was conveyed to Mrs. Sloan. In her answer, Mrs. Sloan states that the purchase-money of the sale of the property by Edwards to Sloan and Mendon, was not paid, but notes were given for it, and that the conveyance to Mrs. Edwards was made merely by way of mortgage in order to secure the payment of that money to Edwards, and that Edwards's claim for unpaid purchase-money under that deed ought to have priority over the complainant's mortgage. She also insists that she did not acknowledge the execution of the complainant's mortgage in such manner as to bind her estate in the land.

Edwards and his wife, by their answer, deny the validity of the complainant's mortgage for the same reason given in Mrs. Sloan's answer, and set up the lien for unpaid purchase-money, alleging that Edwards, after the conveyance to Sloan and Mendon, held possession of the premises in accordance with an understanding that he should do so as security for the payment of that money, and that that lien is entitled to priority over the complainant's mortgage. They claim, also, that he is entitled to subrogation in respect of the payment by him after the conveyance to Sloan and Mendon of the $6,000 mortgage, subject to which the property was, as they allege, sold and conveyed to Sloan and Mendon. Kate Edwards and her husband, by their answer, set up the release to the former and insist on its validity. W. H. M. Sistare, by his answer, insists upon the priority of the Crossman mortgage assigned to him, on the ground that it was given to secure notes or endorsements of notes (or the renewals thereof) given by Sloan and Mendon on account of the before-mentioned purchase-money. Mrs. Allen sets up her mortgage upon the land conveyed to Kate Edwards, and insists upon the validity of the release.

It appears, by the testimony, that the complainant's mortgage was given to Mr. Winston by Sloan and his wife, in pursuance of the terms of a settlement of a claim which was made by stockholders of a company located in the city of

Tooker *v.* Sloan.

New York (The Mitchell Non-Explosive Boiler Company), against him, for his failure to perform his undertakings in regard to the company and its business interests, and his transactions in connection with its stock, whereby, as they alleged, they were prejudiced as stockholders.   Mr. Winston, in consideration of the mortgage, was to pay certain claims against the company to the amount of the money secured by the mortgage.   Sloan was represented by counsel in the litigation which was commenced against him, and in the consequent settlement of the matters in controversy. Though he was disturbed, and perhaps distressed, under the charges which were made against him, and was extremely anxious to effect a settlement of the claim, that fact is of itself, of course, not enough even to cast suspicion upon the conduct of those who were pressing him.   It does not appear that they were not acting *bona fide*, nor does it appear that their charges were false and unfounded.   The settlement provided for no payment to the stockholders, or any of them, directly, but merely for the payment of certain claims outstanding against the company.   That he was not an imbecile, nor so affected in mind as to be unable to take care of his interests, abundantly appears.   He was represented by counsel, as already stated, and was in daily consultation with his friend Crossman.   So far as the action of his wife, in consenting to give the mortgage, is concerned, it is very evident that she was merely dealing with his property.   She had never paid anything for the property, nor had she agreed to pay anything for it.   It was bought by her husband and Mendon from Edwards, and she, herself, says that the purchase-money was never paid.   They gave their notes or endorsements for the purchase-money, and the title was passed from them to her without any consideration whatever.   She undoubtedly held it merely in trust for her husband.

Sloan continued to do business for more than a year after the giving of the mortgage.   It is proved that in June, 1875, he made the arrangement (carried out on the 8th of July

following) with Crossman, by which the latter was to have security, by second mortgage on the mortgaged premises, for those of the notes or endorsements (or renewals thereof), given for purchase-money of the property, which Crossman had discounted, and which he held. By the arrangement Sloan and his wife were to convey the premises to Mrs. Edwards, who was to give the mortgage security to Crossman. This arrangement was made, and in pursuance thereof the notes were delivered up to Sloan, in consideration of the mortgages given to Crossman by Mr. and Mrs. Edwards. And, again, on the 20th of March, 1874, nearly three months after the complainant's mortgage was given, Sloan, with his wife, signed a certificate, by which, in consideration that the complainant was about to take an assignment of that mortgage, they certified to her that the mortgage was then a subsisting, valid, legal and equitable claim and encumbrance upon the property described in the mortgage, for the full amount of $4,465.87, with interest from the date of the mortgage; that the amount thereof was justly due and owing by them to Winston, and that they had no defence whatever in law or equity against it or any part of it.

When it is considered that between the time when the mortgage was given and the time when this certificate was made, a period of many weeks had elapsed—time enough for reflection and all needed advice—and that at the latter period the mortgage was still in the hands of Winston, who as yet had paid nothing under it, nor raised any money on it; the fact that Sloan and his wife voluntarily gave this certificate to enable Winston to negotiate the mortgage, and to that end to induce the complainant to invest her money in it, is of no slight importance.

Mr. Crossman, who was sworn as a witness on the subject of Sloan's incapacity, not only does not establish it, but, on the contrary, shows his full competency to transact business. He says that, as to his bodily health, he should think Sloan was then in good condition. He testifies, indeed, that he

Tooker *v.* Sloan.

was extremely distressed through apprehension of the legal proceedings which were in contemplation, because of their effect on his reputation and that of his family, but his statement of the conversations between Sloan and himself on the subject, shows that the former was fully possessed of the requisite mental qualifications for the transaction of even that business.　It is worthy of special note, too, that, as before stated, there is no evidence that he was not, in fact, justly liable to the charge made against him.

By the agreement of settlement Winston agreed to pay the debts for which the mortgage was given, and to indemnify Sloan and his wife against them, and all costs &c. on account of them.　Both he and Tooker swear that those debts have been paid.　There is, indeed, evidence that some of them have not been paid, but much of that evidence is far from satisfactory.　Moreover, there is no evidence that Winston has not indemnified Sloan and his wife against the debts.　And again, the answer of Mrs. Sloan sets up no defence on that head.

Nor is there any proof of the allegation, made in her answer, that the execution of the mortgage was not acknowledged in such manner as to bind her property. The certificate contains all the statutory requisites.　The acknowledgment was made before a duly authorized person in New York, and the certificate required by law as to the authority of the person by whom the acknowledgment was taken, accompanied the certificate of acknowledgment.　There is no evidence to overthrow the certificate of acknowledgment.　That the officer by whom the acknowledgment was taken cannot recollect that he examined her separate and apart from her husband, and that she cannot remember whether she was so examined or not, of course cannot countervail the certificate.

The claim of paramount lien for purchase-money has not been established.　Edwards himself never claimed any lien on that account until after the commencement of this suit. When, before the complainant took the assignment of her

mortgage, her husband went to the mortgaged premises, and there saw Edwards, the latter not only did not set up any claim of lien for unpaid purchase-money, but told Mr. Tooker when it was that he sold the property to Sloan, and how he came to sell it to him; what the land was worth; that he had been paid all the purchase-money, and urged Mr. Tooker to take the mortgage, and said that it was a good, valid and perfect mortgage in every way, and would, undoubtedly, be paid at maturity. He further said that, if Tooker bought the mortgage, he would like him to see if he (Tooker) could not buy the land and sell him a part of it. He further said that he had possession of the property for drying paper (he was a manufacturer of paper), as a privilege from Sloan, in consideration of his paying the taxes and keeping up the fences. And when, after the complainant had become the owner of the mortgage, her husband and Winston, on the 4th of July, 1876, went there, Edwards, in reply to the interrogative remark of Mr. Tooker, " I suppose you have received your pay from Mr. Sloan for this property?" said, " Yes; Mr. Sloan does not owe me a cent on it." Winston swears that, in the same conversation, Edwards, who was very anxious to obtain a part of the property, asked Mr. Tooker if he thought he (Tooker) could negotiate with Sloan and buy the property; to which Tooker said that Sloan was anxious to sell it to him, at some price; and Edwards then said, if Mr. Tooker would purchase it, he would give him $9,000 for a certain portion of it, which he designated. Again, in 1876, when endeavoring to induce Mr. Tooker to wait longer for the unpaid interest on the mortgage, he said, " Why need you be in any hurry for your interest ? you know you have got a good mortgage there—just as good as gold;" and, though he earnestly requested Mr. Tooker and Mr. Byrne, the complainant's solicitor, not to foreclose, and urged them to give him time to raise the money to take up the mortgage, he at no time mentioned any claim of lien for unpaid purchase-money,

Tooker *v.* Sloan.

although he threatened to "give the complainant a long fight for her money if she would not wait."

Nor is the claim made in the answer of Edwards and his wife, that the conveyance to the latter was merely by way of mortgage to secure the unpaid purchase-money, sustained. The only witnesses who speak on the subject are Mrs. Sloan and Mrs. Edwards, and it is manifest that neither of them had any personal knowledge of such arrangement. All they know on the subject was derived from their respective husbands, who were, it seems quite probable, the real parties in interest. The arrangement for the giving of the two mortgages to Crossman was made between Sloan and Crossman. The latter testifies as follows, in reference to it: "Sloan was indebted to me, and, in order to cancel that indebtedness—Mr. Edwards had long wanted the property; in fact, he had wanted it ever since Mr. Sloan purchased it, and offered to buy it back of him, and he would buy it back and give me a mortgage to cover the entire indebtedness." To the question, "Then you say that he (Sloan) procured a mortgage from Charles P. Edwards and wife to you, upon this Summit property, to secure that indebtedness?" he answered: "Indebtedness! the reverse of that. I said that he sold this property to Edwards, and Edwards gave this mortgage to me, direct." This was in June, 1875, and the deed from Sloan and his wife to Mrs. Edwards was made at that time, and Edwards and his wife then gave the two mortgages to Crossman. Crossman says he understood that his mortgages were subsequent to the complainant's mortgage. The claim to subrogation is not established. Both of the mortgages, which were on the property when Edwards conveyed to Sloan, appear to have been cancelled of record, on the application of Sloan himself, and there is no evidence that Edwards paid or contributed to the payment of either of them.

The complainant insists that she is not bound by the release executed in favor of Mrs. Kate Edwards by Mr. Byrne, as her attorney in fact, releasing eighty-four one-

hundredths of an acre of the mortgaged premises from her mortgage. She was, when the release was executed (December 20th, 1875), in Europe, with her husband. She returned in August, 1876. Her mortgage became due on the 31st of December, 1875, eleven days after the release was executed. Mr. Byrne had authority to receive the principal of the mortgage when due, as before stated; it was not due when the release was given, but would be in eleven days. He executed the release, and soon afterwards (by letter of March 9th, 1876) sent the consideration, $500, which was all that was paid for the property, to his principal, as and for so much money received in consideration of the release. She retained the money, acknowledging the receipt of it by letter of April 9th following. In a settlement and account made by him with her in October, 1876, Mr. Byrne charged himself with $500 of principal received from Kate Edwards on account of Mrs. Sloan's bond, and the complainant received the benefit of the amount in the settlement, Mr. Byrne paying the balance of the account, and that amount being credited to the complainant therein. On the faith of the release, Kate Edwards, having raised money from her mother, Mrs. Allen, on mortgage of the property, proceeded to improve it, and expended, in building a dwelling-house and putting other improvements thereon, about $5,000. Mrs. Allen took her mortgage on the faith of the release. The price paid for the property, which was unimproved, is proved to have been a full price for it, and the house and other improvements so enhanced the value of the rest of the mortgaged premises that Crossman released the property from his mortgages without other consideration. It is true, Mr. Tooker says there was dissatisfaction on his part with the action of Mr. Byrne in receiving the $500 of principal. He says it was because the latter had no right to receive it; but though Mr. Byrne swears that he notified Mr. Tooker, by letter, of the fact that he had released to Mrs. Kate Edwards part of the property, for $500, soon after the transaction took place, Mr. Tooker explicitly

declines to produce the letters received by him from Mr. Byrne.

Mr. Byrne says that after Mr. and Mrs. Tooker returned to this country, the former found fault with him for having released the property, but it was merely because there was, as Tooker said, a building of some kind (his impression is it was a blacksmith's shop) upon it. According to the proof, however, there was no building on the premises. Mr. Tooker says he expressed his dissatisfaction with the release, but it was expressed to Charles P. Edwards, not to Kate Edwards or her husband. It appears, beyond controversy, that the complainant received, with full knowledge of the circumstances, the amount paid by Kate Edwards for the property. Though Mr. Tooker says he tendered the money back, it was not to Kate Edwards but to Charles P. Edwards. The complainant is in equity bound by the release. She ought, if she had intended to repudiate the act of her agent, to have done so as soon as it came to her knowledge. She did not do so, but, on the contrary, received and retained, with full knowledge of the facts, the consideration of the release, and it was not until after she returned from Europe that any dissatisfaction was expressed in regard to it, and on the 9th of October, 1875, about ten months after the release was given, she allowed the consideration money of the release in her agent's account. She has acquiesced in her agent's action in giving the release, and she cannot now be permitted to repudiate it to the damage of the purchaser or the mortgagee—the former of whom, in reliance upon it, has made large expenditures upon the property, and the latter, in like confidence, has loaned her money on the security of the premises.

There will be a decree in accordance with these views.